**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  06-0125-02 (RBW)** |
| | : | |
| **v.** | : | |
| | : | |
| **VAVA PIERRE** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia,  respectfully submits this memorandum in aid of sentencing.

**I.    <u>BACKGROUND</u>**

On July 27, 2006**,**  the defendant  pleaded guilty to Hostage Taking, in violation of  18 U.S.C. § 1203(a) .  The undisputed statement of facts showed that on March 24, 2006, Pierre, along with co-defendant Charles Dorius and another person known as "Black", planned to kidnap a ten year-old child.  Both Pierre and Black were armed with pistols.  The three walked down the street to the victim's house.  While Dorius stood across the street from the victim's house, Pierre and  Black walked back and forth in front of the house.   As the car carrying a mother and her two school-age daughters pulled out of their driveway to go to school, Pierre and Black approached the car, with pistols drawn and removed the victim's mother and sister from the car. The mother literally begged the defendant and his accomplices to take her instead, and not her ten year-old daughter.  Unmoved by the mother's pleas, Dorius, Pierre and Black entered the car. Dorius got into the driver's seat, Pierre entered the front passenger seat of the car, and Black sat in the back seat with the little girl.  Dorius drove the car to a house where they had already planned to put the victim.  While driving there, both Dorius and Black referred to Pierre as

"Commandant".  Both Pierre and Black were armed with pistols during the entire car-ride to the house.  One of the men decided that the victim's school uniform might attract attention.  As a result, the men pulled over **to** the side of the road and bought a t-shirt from a street vendor and placed it on the victim.  The men drove another two hours and arrived at the house.  Once they arrived at the house, Pierre got out of the car and went up to the house to see if the fourth person who was supposed to be waiting at the house was there, while Dorius and Black stayed in the car with the little girl.  Pierre returned to the car and informed Dorius and Black that the person had not arrived yet.  The three men waited with the little girl inside the car for another two hours until the fourth man arrived.  Once he arrived, Pierre, while still holding the gun, escorted the little girl to the house while Dorius and Black waited in the car.  The fourth man took the little girl to a bedroom.  While in the room, the only contact that the little girl had with anyone was that two men asked her if she wanted food.  The victim declined food and water.  According to the evidence the little girl was not physically harmed during her several hour long captivity.

In the meantime, Dorius, Pierre and Black drove off to get rid of the car.  While driving, they discussed the amount of ransom they would demand from the mother.  They had agreed that they were going to ask for $100,000 for ransom.  During the course of the drive, the men noticed a Haitian National Police ("HNP") police car.  Although the men tried to elude them, the police vigorously  pursued them.  During the course of a subsequent foot chase, Black was shot and killed by the police, and Pierre and Dorius were arrested.  After his arrest, Pierre led the HNP to where the victim was being hidden.  The HNP rescued her.  The little girl was found in the bedroom where she was originally taken.  Further investigation revealed that the little girl was a United States citizen.

Both Dorius and Pierre provided statements to the HNP, and to the FBI and admitted their role in the kidnapping.

## II.    SENTENCING CALCULATION

    A    <u>Statutory Maximums</u>

Pursuant to Title 18, United States Code, Section 1203 carries a maximum penalty of up to life imprisonment, and a maximum term of supervised release of five years.

    B.    <u>Sentencing Guidelines Calculation</u>

The Guidelines calculation utilized in the Presentence Report ("PSR") calculates the defendant's total offense level at 31.  <u>See</u> PSR ¶ 28.   The PSR calculates the defendant's criminal history as Category I.  <u>See</u> PSR ¶ 31. The guideline range for the defendant is calculated at 108 to 135 months.

## III.    GOVERNMENT'S RECOMMENDATIONS

    A.    <u>Acceptance of Responsibility</u>

The government agrees with the PSR¶ 27 that the defendant's base offense level should be decreased by three points pursuant to Section 3E1.1 of the Sentencing Guidelines since he accepted responsibility for his conduct.

    B.    <u>Adjustment for Role</u>

The government agrees with the PSR ¶ 23 that the defendant's base offense level should be increased by two levels pursuant to Section 2 A 4.1(a) based on the facts of this case.

    C.    <u>Application of the Federal Guidelines post-Booker</u>

It is the government's position that the Court should impose a sentence within the guidelines range.  In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that

3

the mandatory application of the United States Sentencing Guidelines violates the Sixth

Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a

consequence, the Court invalidated the statutory provision that made the Guidelines mandatory,

Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756. However, the Court

expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld

the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the

most reasonable sentence for a particular defendant who has committed a particular crime.

Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the

range as set forth in the Guidelines, the Court must state in a written order of judgment and

commitment the specific reason for the imposition of a sentence different from that described in

the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review

by courts of appeals for "reasonableness." Id. at 769.

  In Booker's wake, this Court must continue to resolve disputed questions of fact and law

and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See

Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report

or determine that resolution not necessary to sentencing). "The district courts, while not bound

to apply the Guidelines, must consult those Guidelines and take them into account when

sentencing." Booker, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)).

In light of this mandate – and the continued requirement of written explanations for sentences

that fall outside of the range called for by the Guidelines and the new standard of

"reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is

reasonable per se. Not only is a sentence within the Guideline range reasonable per se, but it also

accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence. See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168

(Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns."  Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now be reviewed instead for its "reasonableness."  See Booker, 125 S. Ct. at 764.  Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) – provide the most concrete yardstick against which to measure what would be unreasonable.  Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals reasonableness review.  See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing and should occur absent unusual circumstances.  This is so, said the court in United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson

held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at 912.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report.

        This Court should consider the harm to the victim and her family, and the potential harm defendant may have caused to others.  When Pierre and his cohorts kidnaped the little girl, they put in motion the potential for serious harm to the child and others.  Pierre and his fellow kidnapers struck stark and unspeakable fear in the mother who had to watch three men take her daughter away in her car.  Although, ultimately, the child was not harmed physically, she could have easily been harmed by the fourth man with whom she was left, and/or killed by one of the kidnapers, or even by the HNP.  This was a seriously violent and vicious act that could have had

8

extraordinary consequences.  Moreover, the escape scenario could have been deadly to many

innocent bystanders.  During the entire event, Pierre showed complete disregard for the life and

safety of everyone else only to make good his escape.  For this he should be punished.

Accordingly, the government believes that a prison term of within the guideline range  is

appropriate.

**IV.**    <u>**CONCLUSION**</u>

Wherefore, the government respectfully requests that the Court sentence the defendant to

a prison term within the guideline range.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
Bar No.  498610

_____

JULIEANNE HIMELSTEIN
Assistant United States Attorney
Major Crimes Section, Mass.  Bar No. 417-136
555 4th Street, N.W.  Room 4832
Washington, DC 20001
Phone: 514-8203
Fax: 353-9414

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney
for the defendant, Elita Amato, this ___ day of December, 2006.

_____

JULIEANNE  HIMELSTEIN
Assistant United States Attorney